No. 22-5638

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

RICHARD DEVORE

*Plaintiff-Appellant*,

v.

UNITED PARCEL SERVICE CO.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky, Louisville Division,
Case No. 3:19-cv-00731-CRS-RSE

**BRIEF OF APPELLANT, RICHARD DEVORE**

John S. Friend
Chris K. Stewart
Lauren E. Freeman
Bishop Friend, P.S.C.
6520 Glenridge Park Place
Suite 6
Louisville, KY 40222
(502) 625-2600
John@bishoplegal.net
Lauren@bishoplegal.net
Chris@bishoplegal.net
*Counsel for Plaintiff/Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF CITATIONS ............................................................... ii

I.  STATEMENT CONCERNING ORAL ARGUMENT .................................... 1

II. STATEMENT OF JURISDICTION ................................................ 2

III. STATEMENT OF THE ISSUES ................................................. 2

IV. STATEMENT OF THE CASE .................................................... 2

    **A.**   THE FACTS. ............................................... 2

    **B.**   PROCEDURAL HISTORY ........................................ 7

V. SUMMARY OF THE ARGUMENT ................................................... 8

VI. ARGUMENT ................................................................ 24

    **A.**   Standard of Review ....................................... 14

    **B.**   FMLA Retaliation and *McDonnell-Douglas* ............... 15

    **C.**   Mr. DeVore provided adequate notice of his intent to exercise FMLA rights. ...................................... 17

    **D.**   Genuine issues of material fact exist with respect to a causal connection and pretext ........................... 21

    **E.**   The lower court erred in its reliance on the "honest belief rule" to resolve disputed issues of fact in UPS's favor ............................................................ 26

CONCLUSION ...................................................................... 29

CERTIFICATE OF COMPLIANCE
CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**Page**

## CASES

*Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074 (3d. Cir. 1996)................... 16

*Asmo v. Keane, Inc*., 471 F.3d 588 (6th Cir. 2006)................................. 23

*Bledsoe v. TVA Bd. of Dirs*., 42 F.4th 568 (6th Cir. 2022).................................. 26

*Bryson v. Regis Corp*., 498 F.3d 561 (6th Cir. 2007) .......................................... 15

*Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013)................................................ 14

*CareToLive v. FDA*, 631 F.3d 336 (6th Cir. 2011). ............................................. 13

*Cooper v. Perfect Equip., Inc*.,
2015 U.S. Dist. LEXIS 29871 (M.D. Tenn. Mar. 11 2015) ............................ 21

*Craddock v. FedEx Corp. Servs.*, 2022 U.S. App. LEXIS 3632, No. 20-5655
(6th Cir., Feb. 9, 2022). ......................................................................... 28

*Cutcher v. Kmart Corp*., 364 F. App'x 183 (6th Cir. 2010). ................................ 21

*Dixon v. Gonzales*, 481 F.3d 324 (6th Cir. 2007). ............................................... 15

*Edgar v. JAC Prods., Inc*., 443 F.3d 501 (6th Cir. 2006)..................................... 15

*Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344 (6th Cir. 1998). ........ 15

*Griffith v. Franklin County*, 975 F.3d 554 (6th Cir. 2020).................................. 14

*Marshall v. Rawlings Co. LLC*, 854 F.3d 368 (6th Cir. 2017). .......................15, 21

*Miles v. South Cent. Human Res. Agency, Inc*.,
946 F.3d 883 (6th Cir. 2020)................................................................... 26-27

*Peffer v. Stephens*, 880 F.3d 256 (6th Cir. 2018)................................................ 14

*Riordan v. Kempiners*, 831 F.2d 690 (7th Cir. 1987).......................................... 16

*Slusher v. United States Postal Serv*., 731 Fed. Appx. 478 (6th Cir. 2018). ......... 20

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). ...................................16, 22

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). ............................... 22

*Tilley v. Kalamazoo Cnty. Rd. Comm'n*, 654 F. App'x 675 (6th Cir. 2016) .......... 24

*Wallace v. FedEx Corp.*, 764 F.3d 571 (6th Cir. 2014) ................................... 17-18

*Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400 (6th Cir. 2021). ............................ 28-29

## REGULATIONS

29 C.F.R. § 825.302(c). ......................................................................................... 21

29 C.F.R. § 825.303(b). ......................................................................................... 18

## OTHER AUTHORITIES

Edward A. Kearney, *Death of a Rule*, 16 U.C. Davis Bus. L.J. 1 (2016). ............. 26

## I.    STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a), and Sixth Cir. R. 34(a), Appellant/Plaintiff believes the factual record in this case and the nature of the legal arguments at issue present a circumstance where the Court would be assisted in reaching its disposition with the benefit of oral argument. Appellant/Plaintiff respectfully requests this case be placed on the Court's oral argument calendar.

## II.    STATEMENT OF JURISDICTION

The District Court possessed federal question jurisdiction in this case under 28 U.S.C. § 1331 and 29 U.S.C. § 2609, because Mr. Devore brought this action for retaliation under the Family Medical Leave Act ("FMLA"). [*See* Order on Def.'s Mot. Sum. J., R. 69, PageID # 553]. This Court possesses jurisdiction over this appeal under 28 U.S.C. § 1291, because this is an appeal from a final order and judgment of the District Court. Plaintiff timely filed his Notice of Appeal within thirty-days of the District Court's final judgment. FRAP 4(a)(1); FRAP 3(a)(1).

## III.    STATEMENT OF THE ISSUES

1. Did the District Court err in holding that the Plaintiff did not provide adequate notice of his need to take FMLA leave, even though the employee specifically informed his supervisor that he would need to take time off for an upcoming surgery?

1

2. Can a plaintiff in an FMLA retaliation case create a jury question as to causation and pretext by—in addition to temporal proximity—presenting evidence that the employer's stated reason for termination was a common kind of mistake for which no other employee had ever been terminated?

3. Did the District Court err in holding that the honest belief rule shielded the Defendant from liability, even though the Plaintiff presented specific evidence that could lead a reasonable juror to question the Defendant's true motivation in terminating the Plaintiff?

## IV. STATEMENT OF THE CASE

### A. THE FACTS

This is a case about a UPS supervisor, Jeff Johnston, who learned that a nearly thirty-year employee, Mr. DeVore, would need to take FMLA leave during peak season and fired him in order to avoid the inconvenience. Mr. Johnston's stated reason for firing Mr. DeVore? A common paperwork mistake. This paperwork mistake caused UPS to overpay one pilot on one occasion a total of $96.12. Mr. DeVore maintains it was an honest and de minimis mistake, made while he was contemporaneously focusing on a separate, far more significant matter. [DeVore Depo., R. 62-1 at PageID # 416. In addition, Mr. DeVore was working double duty to cover for a sick coworker. *Id.* UPS argued that this slight overpayment was an intentional and terminable act. The District Court erroneously resolved this

evidentiary dispute, concluding that Mr. DeVore intentionally violated UPS' integrity policy.

Mr. DeVore started work for UPS in 1990 and in 2000 applied to be a flight crew scheduler because his previous job was displaced to South Carolina. [*Id.* at PageID # 402]. Mr. DeVore had long wished to be a pilot but could not afford the training. Scheduling flight crews seemed to be the next best thing. Id. For the next eighteen years, Mr. DeVore worked as a flight crew scheduler, eventually rising to Grade 13, the highest level for his position. [Wharton Depo., R. 62-2, PageID # 432-33].

As for the nature of this work, Mr. DeVore's colleague Enid Wharton described the job this way: "Basically, we're in charge of making sure that the crew members are flying legally per the FAA. We have a contract that we follow with the rules that changes constantly. We also have to make sure that they have legal duty days and schedules per the FAA. And we basically track the crew members and cover the flights pretty much. It's a very fast-pace, multitask, stressful position." [*Id.* at PageID # 431; *see also* Job Description of Flight Crew Scheduler, R. 54-2].

Mr. DeVore's co-workers recognized and appreciated the depth of experience and his acquired skills. Chelsey Downs, a fellow flight crew scheduler, said that Mr. DeVore "always knew what to do. He was very good at making decisions. He was really good at talking to the pilots and being very personable with them. I mean, he was really good at what he did.... He knew the rules really well and he knew how to

teach other people how to do the job and how to do it quickly." Ms. Downs also noted that "a lot of people trusted to go to him if they needed help." [Downs Depo., R. 62-3, PageID # 442-43)]. Other former coworkers praised Mr. DeVore as well. [*See* Resp. to SJ Mot., R. 62, at PageID # 375].

Moreover, Mr. DeVore's colleagues unfailingly described him as honest and a person of integrity. [*Id.* at PageID # 376 (collecting citations)]. Flight crew schedulers work to facilitate the jobs of pilots. And in this case, one such pilot, Blake Westhoff, submitted an affidavit on Mr. DeVore's behalf. [Aff. of Blake Weshoff, R. 62-7 at PageID # 474-76]. Mr. Weshoff stated that "Rick was good at his job because he cared about the pilots. He realized that it was a difficult job and he took the time to make sure pilots were properly rested. When I called a flight crew scheduler and got Rick it was sure that all details would be taken care of." [*Id.* at PageID # 475]. Mr. Weshoff continued in his sworn statement, describing Mr. DeVore as honest and stating that in his experience "UPS's alleged reason for terminating Rick is ridiculous." [*Id.* at PageID # 476].

Importantly, as Mr. DeVore's supervisor, Mr. Johnston was far from a model of professionalism. In fact, Mr. Johnston's conduct on multiple occasions was inappropriate and downright abusive. For example, the record testimony describes an incident where Johnston threw paper wads at Mr. DeVore while Mr. DeVore was on the phone with a crew member. [Downs Dep., R. 62-3 at PageID # 445-46]. As

Ms. Downs recalls this, Mr. DeVore was engaged in a pleasant exchange with the crew member, and Mr. Johnston chided him in front of his coworkers for what Mr. Johnston perceived as "overly" friendly communication. Ms. Downs described Mr. DeVore's conversation as just good service. [*Id.*].

On another occasion, Mr. Johnston called Mr. DeVore "Kool-Aid man." [Martin Depo., R. 62-4, at PageID # 450-51]. Mr. Johnston made this comment in front of other employees and Ms. Downs stated she was sure Mr. DeVore felt embarrassed. [Downs Depo., R. 62-3 at PageID # 439]. Mr. Martin likewise believed the comment was beyond the scope of what might be considered friendly ribbing. [Martin Depo., R. 62-4, at PageID # 450].

Others testified that Mr. Johnston made inappropriate comments about Mr. DeVore's physical appearance. Former flight crew scheduler Joe Lynott submitted an affidavit stating he overheard Mr. Johnston refer to Mr. DeVore as "Barney," an insult stemming from a reference to the kid's TV purple dinosaur and Mr. DeVore's weight. [Aff. of Joe Lynott, R. 62-8 at PageID # 478]. Mr. Lynott also stated that Mr. Johnston made it clear through inuendo that he did not like gay people. [*Id.* at PageID # 479]. Mr. DeVore identifies as homosexual.

Sometime in 2014, Mr. DeVore began having problems with his feet. These issues are what would ultimately lead to Mr. DeVore's request for FMLA leave that would cost him his job. Between 2014 and 2016, Mr. DeVore took FMLA leave on

two separate occasions for surgeries on each foot. [Resp. to SJ Mot., R. 62 at PageID # 379). Each surgery resulted in Mr. DeVore missing nearly four months of work. [*Id.*]. In March of 2018, Mr. DeVore told his supervisor, Mr. Johnston, that, later in the year Mr. DeVore would need to "go out on disability" for yet another surgery on one of his feet. [DeVore Depo., R. 62-1 at PageID # 406]. While the surgery had not been scheduled yet, Mr. DeVore recognized that he would need to miss work during peak season. [*Id.*, at PageID # 406-07, 421]. Mr. DeVore immediately let Mr. Johnston know and encouraged him to have Mr. DeVore go ahead and train any new hires before he went out on leave. [*Id.*].

As alluded to above, part of the duties of a flight crew scheduler included working under UPS' Collective Bargaining Agreement ("CBA") with the Independent Pilots Association ("IPA"). UPS attached just a small portion of this expansive document to its Motion for Summary Judgment. [Excerpt of CBA, R. 54-5 at PageID # 244]. The CBA is in its entirety several hundred pages long. The CBA contains multiple sections and covers a vast array of topics. Article 13 of this agreement covers flight scheduling, and that portion alone comprises fifty-eight pages.

In 2016 the IPA and UPS altered the CBA to include a new provision affecting how flight crew schedulers should respond to reserve pilots' requests to be released early. [See Def.'s Mot. for SJ., R. 54 at PageID # 187; *see generally* R. 54-5]. The CBA allows some crew members to request that they be released either three or six

6

hours early from their time on reserve duty. The crew member must request the release from the Flight Crew Scheduler. If the scheduler grants the release request for a six-hour early release, the scheduler should enter an RLS6 code. [*Id*.]. Entering the RLS6 code triggers a reduction in the pilot's pay of two hours. Similarly, if the Scheduler grants a three-hour early release, then the scheduler should enter an RLS3 code, triggering a one hour pay reduction. [*Id*.] Under the prior version of the CBA, however, a scheduler had the discretion to not enter a code.

During a very busy shift in May 2018, Mr. DeVore received a call from pilot Lukas Leuenberger. [DeVore Depo., R. 62-1 at PageID # 413]. Mr. Leuenberger requested to be released early. [Id. at PageID # 414]. Mr. DeVore knew Mr. Leuenberger was not going to receive an assignment this late in the day, and determined it was in UPS' best interest to release Mr. Leuenberger from duty as requested. Mr. DeVore did not enter the RLS6 code because, based on the prior version of the CBA, he believed in the moment that he had discretion not to. [*Id.* at PageID # 410].

This was not just Mr. DeVore's opinion. Mr. Martin backed him up in the latter's deposition, noting that "before that code, it was never even around, and it was up to our discretion to do what we wanted to do with that reserve. If we wanted to be a kind person and let a crew member go early, well, then, we just did such a thing at times." [Martin Depo., R. 62-4 at PageID # 458]. Mr. Martin also explained he could

not recall any specifics about the codes because "it's something new" and that "it doesn't happen as often as you think it would." [*Id*.].

Given the CBA's complexity, length, changing rules, the fast-paced, multi-tasking nature of the work, and the FAR, these sorts of mistakes were not uncommon among schedulers. When asked if she had ever made this mistake Ms. Downs said, "I'm sure that's happened, yeah." [Downs Depo., R. 62-3 at PageID # 444]. Mr. Lynott admitted to having "done what Rick did many many times without so much as a blink of the eye." [Aff. of Joe Lynott, R. 62-8 at PageID # 479]. Ms. Yates testified that, early in her career as a flight crew scheduler, she made so many minor errors that she was repeatedly taken into the supervisor's office for counseling and would always bring a box of tissues along with her. [Yates Depo., R. 62-5 at PageID # 469]. And yet, not one of these individuals was ever terminated or formally disciplined.[1]

On May 24, 2018, prior to his next shift after the early release of pilot

---

[1] The District Court wrongly stated that UPS provided "twenty-five separate disciplinary actions taken against DeVore[.]" [Order Granting Summ. J., at PageID # 559 (citing R. 54-10)]. What the Court is actually referring to is nothing other than what UPS itself terms a "development resource tool" or "DRT" that naturally happened as expected and provided for over a long career. DRTs occur when, like here, a crew member makes a mistake. As the title of these tools indicates, they are training tools, not disciplinary procedures. Indeed, the instances in Mr. DeVore's record are all referred to as mistakes, and all involve technical and complex procedures. The lower court seemed to believe this supported a history of disciplinary actions, but it doesn't. Nor did the Defendant even characterize the exhibit as such. The district court improperly weighed this evidence itself and viewed it in a light least favorable to Mr. DeVore.

Leuenberger, Mr. DeVore was summoned to a meeting with supervisors Lauren Miller and Robbie Buchanan. [DeVore Depo., R. 62-1 at PageID # 418]. Ms. Miller and Mr. Buchanan wanted to discuss the fact that Mr. DeVore did not enter the release code for Mr. Leuenberger six days earlier. Mr. Miller and Ms. Buchanan explained to Mr. DeVore that he now in fact lacked the discretion not to enter the code. [*Id.* at PageID # 418-20]. At this meeting, Ms. Miller and Mr. Buchanan had Mr. DeVore do a write up of the incident. [*Id.*] Mr. DeVore did not know what to write and Ms. Miller instructed him to acknowledge what happened, state that it was a bad judgment call, and that it set a bad precedent. [*Id.* at PageID # 419]. He did as instructed.

When UPS began discussing potential disciplinary action among themselves, Defendant referred in an email to Mr. DeVore's actions as a "mistake": "Cissy said this particular guy is paid $46.06 per hour, so this **mistake** cost us $96.12. [sic] However, the average F/O cost is $203.68 per hour, so if he was not probationary, it could have cost a lot more." [Correspondence from unidentified UPS employee, R. 62-9 at PageID # 482].

In another email, Ms. Cissy Skeeters stated: "I've always thought it was unfortunate that we have to pay in situations where someone made a **mistake/promised something in error**." [Skeeters Email, R. 62-10 at PageID # 483] (emphasis supplied). Mr. Johnston wrote "Pay the guy!!! Take it out of Rick's

pay[.]" (May 23, 2018, Johnston Email, R. 62-11 at PageID # 486]. None of these communications indicate any integrity concerns, nor do they indicate a belief that Mr. DeVore acted intentionally.

Also, no witnesses could recall anyone being terminated for the exact or even a similar mistake. Mr. Martin testified that management never communicated that failing to enter a code like this might result in termination, and he knew of no one else who had been terminated for such a mistake. [Martin Depo., R. 62-4 at PageID # 456]. Mr. Lynott, who admitted to making the same mistake on multiple occasions, stated that he never faced any repercussions for failing to enter the code, and he was unaware of anyone else being terminated for doing so. [Aff. of Joe Lynott, R. 62-8 at PageID # 479]. Ms. Yates testified that Mr. DeVore was the only person she was aware of who was ever terminated for a code mistake. [Yates Depo., R. 62-5 at PageID # 470].

Caesha Putt is a current employee in UPS's HR department who formerly worked as a flight crew scheduler. She also testified that she was unaware of any other individual who had been terminated for failing to comply with the CBA or even FAR:

> Q. But it is, however, your testimony that in your time as an HR manager on the flight district, you did not — you cannot recall another instance where an individual was terminated because of their failure to comply with a portion of the CBA or the FAR; is that right?
> A. Not while I was there, no.

[Putt Depo., R. 62-12, at PageID # 489-90].

Ms. Putt did identify, however, what kinds of incidents are actual bases for instances of termination. These include chronic attendance issues, harassment, and fighting on the job. [*Id.* at PageID # 491-92]. In short, none of the extensive evidence collected during discovery in this lawsuit has revealed a single other instance of an employee being terminated for the same or even similar conduct as Mr. DeVore's mistaken failure to enter an RLS6 code in May of 2018.

Despite this, UPS moved forward with termination and ended Mr. DeVore's decades-long career on May 25, 2018. UPS claimed Mr. DeVore violated its "integrity policy." He didn't. Mr. DeVore did not deliberately falsify documents. Instead, he exercised discretion he believed he had at the time and which, under a previous version of the CBA, was his to exercise. He was mistaken. He was not dishonest. UPS knew it was a mistake and described it as such in its own internal correspondence about the incident cited above. The reality is that Mr. DeVore's health issues were becoming an inconvenience for UPS, and they concocted an unsound reason to fire him.

## B. PROCEDURAL HISTORY

The parties conducted discovery and UPS moved for summary judgment. First, UPS argued that Mr. DeVore did not engage in statutorily protected activity because he did not provide adequate notice of his FMLA leave to UPS. [Def. SJ Mot., R. 54

at PageID # 195]. Second, UPS argued there is no causal connection between Mr. DeVore's request to take FMLA leave and the resulting termination. [*Id.* at PageID # 200]. And, finally, UPS contends Mr. DeVore's claim fails as a matter of law because UPS had an honest belief that its decision to terminate Mr. DeVore was for a legitimate business reason, meaning Mr. DeVore cannot show pretext. [*Id.* at PageID # 202].

The district court granted summary judgment to UPS on June 28, 2022. [*See generally,* Opn., R. 69 at PageID # 551-576]. In its order, the lower court held that Mr. DeVore failed to provide adequate notice of his need to take FMLA leave, that even if UPS had notice, no genuine issue of material fact exists as to causation, and finally, that UPS' decision to terminate is unassailable because it was the result of an honestly held belief.

## V. SUMMARY OF THE ARGUMENT

This Court should reverse and remand. First, Mr. DeVore provided adequate notice of his need to take FMLA leave. Mr. DeVore informed his supervisor that he would need to be out to have a surgery on his foot. This is sufficient notice, especially considering Mr. DeVore's previous need for and instances of leave arising out of issues with his feet. Moreover, to the extent UPS had any uncertainty as to whether the surgery would result in a qualifying event, it was UPS's express statutory obligation to seek clarity on the point.

Second, summary judgment is a mechanism to ensure that juries are not left answering questions of law and as a means of disposing of claims that are wholly unsupported by evidence of record. It is intended to discern whether the plaintiff has presented more than a scintilla of evidence and shown enough to permit a reasonable jury to find in their favor. *CareToLive v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011). It is not an open invitation for a trial court to assign weight to the evidence or make determinations of credibility. Here, in granting UPS's motion, the lower court consistently invaded the jury's domain of weighing the evidence and completely failed to construe the evidence in a light most favorable to Mr. DeVore.

Some of the most glaring evidence ignored by the court below bears on its conclusion that Mr. DeVore failed to present a genuine issue of material fact that UPS' stated reason for termination was pretext. Specifically, the Court made no reference to multiple individuals who testified they made the same or similar mistake to Mr. DeVore but were not terminated. The trial court failed to acknowledge the testimony of a current UPS HR employee who testified under oath that she cannot recall a single other individual who was terminated for entering an incorrect code. A jury, presented with this evidence, could very reasonably conclude that UPS' stated reason for terminating Mr. DeVore was pretext for retaliation.

And finally, the lower court misapplied the "honest belief rule." The honest belief rule was originally designed to protect employers who made an objective mistake of

13

fact when terminating any employee. That is, a plaintiff cannot establish pretext simply by showing the employer's proffered reason for termination was something that objectively did not occur. Rather, the plaintiff must provide evidence indicating that the termination may have had a discriminatory motive in order to permit a jury to decide whether the stated reason was pretextual. The honest belief rule cannot be used, as the lower court did here, to credit a defendant's subjective, *post hoc* characterization of an act over evidence undermining that characterization. Mr. DeVore presented ample evidence showing material fact issues undercutting UPS's stated reason for termination. To hold otherwise would render it pragmatically impossible for plaintiffs in discrimination and retaliation cases to take their claims to a jury without direct evidence of discrimination.

## VI. ARGUMENT

### A.    Standard of Review

The Court reviews a grant of summary judgment *de novo. Griffith v. Franklin County*, 975 F.3d 554, 566 (6th Cir. 2020). Summary judgment is appropriate when "no genuine dispute as to any material fact" exists, and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is present where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir.

2018). (Quotations omitted). All reasonable inferences are to be drawn in favor of the nonmoving party. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013).

### B.    FMLA Retaliation and *McDonnell-Douglas*

The McDonnell-Douglas burden-shifting framework applies to FMLA retaliation claims. *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 379 (6th Cir. 2017). Mr. DeVore satisfies his prima facie case requirements by showing material fact issues as to three elements: (a) that he availed himself of a protected right under the FMLA; (b) that he suffered an adverse employment action; and (c) that the two were causally connected. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

A "plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (internal citations omitted). "The burden of proof at the prima facie stage is minimal," and does not require the plaintiff to essentially prove her case as though it were a dress rehearsal for the merits. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). This forgiving standard has a purpose: "A contrary approach would undermine the remedial purpose of the anti-discrimination statutes." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998).

Once Mr. DeVore established his prima facie case, the burden was supposed to shift to UPS to show a nondiscriminatory reason for the termination. When UPS established a nondiscriminatory reason for termination, then the burden returned to

Mr. DeVore to show issues of fact as to pretext. *Id.*

It bears mentioning here, because it is often glossed over, that the paradigm's purpose is to allow individuals who lack direct evidence of discrimination or retaliation to present their case on the merits. Direct evidence — which in this case would consist of UPS essentially admitting that Mr. DeVore's notice of his need for medical leave was the reason he was terminated — is almost unheard of. Employers are almost never so foolish as "to leave the proverbial 'smoking gun' behind." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d. Cir. 1996).

On top of that, as Judge Posner observed, because "most employment decisions involve an element of discretion, alternative hypotheses (including that of simple mistake) will always be possible and often plausible." *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir. 1987). Requiring direct evidence would frustrate Congress's remedial goals embodied by the FMLA, because "it is so easy to concoct a plausible reason for not hiring, or firing, or failing to promote, or denying a pay raise to, a worker who is not superlative." *Id.* at 698.

Finally, a further danger lurking in assessing motions for summary judgment in this context is that much of the case law around *McDonnell-Douglas* was established before 1993. Before 1993 all Title VII cases were tried to the bench, not the jury. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993). This, among other anomalies, is why language saying things like "a plaintiff must prove (x)" rather than

"a plaintiff must show issues of material fact regarding (x)" still occasionally slip into briefs and opinions unchallenged. A plaintiff does not need to prove his or her case to the judge before proving their case to the jury.

### C.    Mr. DeVore provided adequate notice of his intent to exercise FMLA rights.

FMLA protections apply once an employee notifies his employer that "leave is needed." *Wallace v. FedEx Corp*., 764 F.3d 571, 586 (6th Cir. 2014) ("'[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The *employer* will be expected to obtain any additional required information through informal means.' [29 CFR] § 825.303(b)…The employee's burden is not heavy")(emphasis in original).

Mr. DeVore informed Mr. Johnston that Mr. DeVore would need "to go out on disability and have foot surgery." [DeVore Depo., R. 62-1 at PageID # 406]. An employer who is told that a person needs surgery could "reasonably conclude that an event described in the FMLA [29 U.S.C. § 2612(a)(1)] has occurred." *Id*. at 586. In fact, as indicated above, and will be discussed further in an upcoming section, Mr. DeVore had actually obtained leave before, after notifying a supervisor he needed to have surgery. What is more, stating that he would need to "go out on disability" notified UPS that Mr. DeVore would need FMLA leave. UPS had sufficient notice from Mr. DeVore, and the district court's conclusion to the contrary is incorrect.

Beyond the fact that UPS had actual notice, to the extent UPS had legitimate

doubts or questions, it is the employer's responsibility to obtain additional information. That employer obligation is not a judicial creation; it is in the language of 29 C.F.R. § 825.303(b). If the employer feels that it does not have enough information to determine if an event is qualifying, then "[t]he employer will be expected to obtain any additional required information through informal means." If the employer inquires, then the employee must respond; however, by giving "the employer enough information for the employer to reasonably conclude that an event described in the FMLA § [2612(a)(1)] has occurred," the employee triggers FMLA protections. *Wallace*, 764 F.3d at 586.

The lower court made two errors in ruling Mr. DeVore had not provided sufficient notice. The first error is the lower court's treatment of *Wallace*. The lower court focused on the passage in *Wallace* stating that "part of reasonable notice generally includes an indication of the anticipated timing and duration of the leave." *Wallace*, 746 F.3d at 586. But that *general observation* is immediately qualified by the Court as follows: "By focusing on whether Wallace provided enough documentation for continued leave, FedEx largely misses the point of this notice element. The relevant question is whether Wallace provided FedEx with notice that she *needed* FMLA leave, not whether she provided notice that she *needed a certain amount* of FMLA leave." *Id.* (emphasis supplied).

Generally, a person may give an employer an idea of how much time they will

18

need off. But it is not required – and for good reason. Consider the facts in this case: Mr. DeVore told Mr. Johnston about his need for upcoming surgery and Mr. DeVore's need to go "out on disability" as soon as he became aware it was needed. [DeVore Depo., R. 62-1 at PageID # 406-07]. In fact, the notice was so prompt that the surgery had not been scheduled yet. That was a boon to the employer, who could then start the FMLA's required cooperative process with plenty of time on the clock. It even allowed UPS to work with its employee to schedule the surgery and prepare a substitute. Mr. DeVore worked always to alert his management to his medical needs so as to permit scheduling around them. [*Id.* at PageID # 407].

As indicated above, Mr. DeVore's testimony on this point shows his primary concern, aside from his physical repair, was UPS's interest being served by making sure that Mr. DeVore would be able to train new hires in time for peak season. He told Mr. Johnston, specifically, "we might want to go – go ahead and get these new people hired and get them ready to go before peak, you know, if you need me to train someone…" [*Id.* at PageID # 421]. Mr. DeVore explained, "that's what I always tried to do was keep my management team aware when it came to any health issues or anything." [*Id.*]

Under the lower court's analysis, to the contrary, Mr. DeVore should have waited until the last minute when he had all the information to ensure he had FMLA protection. That is not required under the FMLA nor its interpretive case law. Such

19

a rule would punish the dutiful, reward the dawdling, and keep employers from being able to plan leave in tandem with their employees.

The second mistake is contextual. Per Mr. DeVore's testimony—uncontested on this point—he had previously obtained FMLA leave by merely informing his supervisor, that he would need to take time off for a surgery. In fact, when shown an online portal for electronically requesting FMLA leave at his deposition, Mr. DeVore testified he had never seen the website, let alone used it. [DeVore Depo., R. 62-1 at PageID # 406]. He was clear in his testimony that his practice was to tell management he needed leave, who would then (presumably) relay that information elsewhere. [*Id.* at PageID # 407]. But the lower court said that there was "no basis for a reasonable trier of fact to conclude that … UPS was aware he had made such a request." [R. 69 at PageID # 557].

That runs afoul of one of the most basic aspects of the "knowledge" analysis in these cases. If any of "the decisionmakers involved in the determination to [terminate Mr. DeVore] had knowledge of his FMLA status" then UPS had knowledge for FMLA purposes. *Slusher v. United States Postal Serv*., 731 Fed. Appx. 478, 480 (6th Cir. 2018). Mr. Johnston had knowledge and he was involved in discussions surrounding Mr. DeVore's termination. [*See, e.g.,* Johnston Email, R. 62-11 at PageID # 278; Skeeters Email, R. 62-10 at PageID # 484]. That is more than sufficient to show knowledge.

Again, after Mr. DeVore told Mr. Johnston he would need to take FMLA leave, it became UPS' obligation to follow up if it needed greater specificity. 29 C.F.R. § 825.302(c); see also *Cooper v. Perfect Equip., Inc.*, 2015 U.S. Dist. LEXIS 29871,*17-18 (M.D. Tenn. Mar. 11 2015) ("[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means"). Neither Mr. Johnston nor anyone else at UPS sought clarification nor followed up in any way with Mr. DeVore. Under the FMLA, Mr. DeVore cannot be faulted for that.

### D. Genuine issues of material fact exist with respect to a causal connection and pretext.

Once Mr. DeVore established a prima facie case of discrimination, the burden shifted to UPS to show that it terminated Mr. DeVore for a legitimate, nondiscriminatory reason. *Marshall*, 854 F.3d at 379. If UPS did so, Mr. DeVore was entitled to show that a jury could reasonably disbelieve the employer's asserted reason. He could do this by establishing that the reason for the termination: "(1) had no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Cutcher v. Kmart Corp.*, 364 F. App'x 183, 191 (6th Cir. 2010). In this case there is evidence that could lead a reasonable juror to conclude the code mistake did not actually motivate Mr.

DeVore's discipline or that it was not sufficient to warrant his termination.

While separated in the lower court's opinion, causal connection and pretext should really be assessed together in this case because the evidence overlaps (as is common in such cases). The elements of causal connection and pretext are designed to give the plaintiff an opportunity to do one thing: "to demonstrate that the proffered reason was not the true reason for the employment decision"; that immediately "merges with the ultimate burden of persuading the [factfinder][2] that she has been the victim of intentional discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

As the Supreme Court later clarified, showing pretext *permits* a finding of causation: "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination…" *Hicks*, 509 U.S. at 511.

The lower court ruled that Mr. DeVore "relie[d] completely on the fact that he was discharged two months after his request for FMLA leave." [Opn., R. 69 at

---

[2] This quote from *Burdine* says "court," but this is because the case was decided in the pre-jury trial era, mentioned *supra*. Justice Rehnquist, in context, is talking about proving the case generally, not surviving summary judgment.

PageID # 559]. This is incorrect. Mr. DeVore relied on much more than suspicious timing.

It is true that "[t]emporal proximity can establish a causal connection between the protected activity and the unlawful employment action in the retaliation context." *Asmo v. Keane, Inc*., 471 F.3d 588, 593 (6th Cir. 2006). Mr. DeVore has shown a close temporal proximity of less than two months between his notice and the adverse employment action. While that alone can be sufficient, Mr. DeVore presented a good deal of other evidence in support of his claim:

- Ample record evidence of UPS employees engaging in similar acts and not being terminated [*See* discussion in Statement of the Case at 2-10];

- Mr. DeVore's supervisor implying that a mistake costing UPS less than one hundred dollars should be taken out of Mr. DeVore's pay [Johnston Email, R. 62-11 at PageID];

- Mr. Lynott testifying that, in his experience, UPS has demonstrated a retaliatory predilection in an analogous context; if it does not approve of an employee's engaging in protected activities, UPS will find a reason to terminate him or her. [Aff. of Joe Lynott, R. 62-8 at PageID # 479].)

- A UPS employee swearing under oath that in his experience with UPS he had never seen a person terminated for what Mr. DeVore did and that UPS's explanation for Mr. DeVore's termination was "ridiculous." [Aff. of

Blake Weshoff, R. 62-7 at PageID # 476];

- Multiple employees testifying that mistakes, write-ups, and disciplinary matters were extremely common [*See* discussion in Statement of the Case at 2-10];

- The fact that what Mr. DeVore did was previously permissible and that UPS was aware of that;

- That, although Mr. DeVore had had to take FMLA medical leave for his feet at UPS twice before, this was the first time he had requested FMLA leave under Mr. Johnston;

- UPS employees involved in the investigation referring to Mr. DeVore's actions as a "mistake" in email threads with the decisionmakers. [*See e.g.* Skeeters Email, R. 62-10 at PageID # 484].

The lower court focused solely on UPS's proffered reasons and did not credit any of the above record evidence. At a minimum, that fails to view the facts in a light most favorable to Mr. DeVore. A reasonable juror could easily hear these facts and conclude that Mr. DeVore's termination was motivated at least in part by his need to take FMLA leave. *See Wallner v. Hilliard*, 590 F. App'x 546, 554 (6th Cir. 2014). This Court has not hesitated to remand and find a jury question under far less evidence than the above. In *Tilley v. Kalamazoo Cnty. Rd. Comm'n*, 654 F. App'x 675 (6th Cir. 2016), for instance, the mere fact that an employee would not

24

communicate about the whereabouts of a pager while on leave was sufficient to raise a jury question as to whether the employee's need for FMLA leave partially motivated their termination.

Also, the Court's reference to Mr. DeVore's previous employment history fails both in classifying development resource tools ("DRTs") as "disciplinary" at all as well as in misperceiving their significance. First, as noted above, these were training resources, developmental tools, not instances of discipline. Additionally, with respect to the significance of the DRTs, they were spread over a period of five intense years of flight scheduling. [*See* DRTs, R. 54-10 at PageID #276-277]. The testimony in this case shows that mistakes were a reality of this job. As set forth in detail above, multiple witnesses have testified that mistakes were routinely made because of the stressful work atmosphere, necessary multitasking, and complex and fast-paced nature of the job. Multiple witnesses have also testified that CBA violations were routine. UPS cannot rely on this type of misdirection to undercut temporal proximity when there is no indication that it terminated other employees for similar mistakes, nor, even more starkly, any showing that UPS ever considered such mistakes to be terminable actions before or since Mr. DeVore's termination.

Mr. DeVore has shown a genuine issue of material fact with respect to causation and pretext. The court below improperly weighed the evidence and failed to interpret it in a light most favorable to Mr. DeVore. Therefore, Mr. DeVore respectfully

requests this Court reverse the district court's decision.

### E.    The lower court erred in its reliance on the "honest belief rule" to resolve disputed issues of fact in UPS's favor.

The lower court also erroneously ruled that, even if Mr. DeVore could establish issues of material fact on everything in the case, the "honest belief rule" mandated ruling in UPS's favor. This is incorrect for two reasons. First, the honest belief rule does not apply when the question is how one characterizes evidence. It only applies when the dispute is whether someone honestly believed something objectively occurred. Second, there are facts calling UPS's honest belief into question.

At the outset, it should be noted that the "honest belief rule" has come under harsh criticism from courts and commentators alike. And for good reason. It is not to be found anywhere in the statutory text of Title VII, the FMLA, nor any other anti-discrimination or anti-retaliation law. Rather, a Seventh Circuit panel created the rule in 1987 during Title VII's pre-jury trial era when judges were the factfinders. *See* Edward A. Kearney, *Death of a Rule*, 16 U.C. Davis Bus. L.J. 1, 8 (2016). It has also never been endorsed — or even *mentioned* — by the United States Supreme Court.

That is part of the reason why this Court has been clear that the rule "does not command blind deference to an employer's business judgment… Applying the rule only makes sense when a plaintiff relies solely on irrational bases for an employer's

actions to demonstrate pretext." *Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568, 585 (6th Cir. 2022) (citations omitted). *See also Miles v. South Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 890 (6th Cir. 2020) (the "honest belief" rule only applies as a defense to a lack of a factual basis for the legitimate nondiscriminatory reason proffered by the employer.)"

Put another way, it can only be invoked when the plaintiff is arguing that the thing that led to termination did not even happen. Mr. DeVore never argued that he failed to enter the proper release code. What he argued was that he made a mistake in believing he had the discretion to release the pilot. Unfortunately, the rule often gets misplayed as a purported trump card in asking the court to act as a factfinder and credit the employer's explanation in the face of countervailing evidence or contrary characterizations. That is what happened below.

As pointed out, *supra*, Mr. Martin testified that the previous CBA had allowed flight crew schedulers the leeway to make a discretionary call in just this situation, corroborating Mr. DeVore's point that his exercise of discretion in allowing it was a good faith mistake. [Martin Depo., R. 62-4 at PageID # 458]. This is not the same thing as saying that something did not happen. It is saying that he disagreed with UPS's characterization that his act was "intentional" in the sense of a willful disregard of the rules. The honest belief rule, to the extent it should be used in any case, does not apply to these facts.

Unfortunately, the lower court took the bait:

> UPS maintains that the decision to terminate DeVore's employment was because DeVore's conduct was intentional and, hence, in violation of the UPS Integrity Policy. DeVore claims that he does not challenge the factual basis behind UPS' proffered reason for his termination. However, this is not true. DeVore insists that he did not violate the UPS Integrity Policy because his decision not to enter the release code was the result of a "good faith mistake" made while working under pressure. Therefore, DeVore does contest the factual basis for his discharge.

[Opn., R. 69 at PageID # 560].

That is not how the "honest belief rule" functions. Mr. DeVore is not contesting that the phone call occurred, that he released the pilot early, or even that, under the current CBA, he did not then have the discretion to do so. Mr. DeVore is saying he made an honest mistake and that UPS intentionally mischaracterized Mr. DeVore's actions because its true motive was a desire to terminate Mr. DeVore for needing FMLA leave. A reasonable jury could believe that UPS's proffered reason is pretextual under these facts. *See Hutchins v. Chicago Bd. of Ed.*, 781 F.3d 366, 368-69 (7th Cir. 2015). The honest belief rule cannot be used to end run the jury's right to make factual determinations. *Id.* at 368.

This Court has recently clarified that an employer cannot checkmate a plaintiff's civil rights claim by the mere expedient of invoking the "honest belief rule." A defendant may not "enjoy the protection" of the "honest belief rule" if the plaintiff demonstrates pretext by showing that the stated reason for termination did not "actually motivate" the adverse action. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400,

425 (6th Cir. 2021). In *Wyatt*, an employer claimed it had an "honest belief" for issuing bad performance reviews. *Id.* at 425. The plaintiff, who also exercised her rights under the FMLA, presented evidence that her performance was not as bad as her employer claimed. *Id.* This Court reviewed that evidence and concluded that the defendant couldn't escape liability simply by stating it had an "honest belief" that the plaintiff was performing poorly. *Id.* at 425-26. Rather, the Court concluded that a jury could hear the evidence of why the stated reason for the adverse action was pretext and conclude that there was a causal connection between the plaintiff's assertion of FMLA rights and the defendant's adverse action. *Id.* at 427.

Mr. DeVore's case is right on point. A jury could hear all the evidence enumerated here and to the court below and conclude that UPS' stated reason for terminating Mr. DeVore wasn't simply an honest belief, but was instead pretextual. The reasons resulting in remand in *Wyatt* strongly favor remand here. *See also*, *Craddock v. FedEx Corp. Servs.*, 2022 U.S. App. LEXIS 3632, No. 20-5655 (6th Cir., Feb. 9, 2022).

## CONCLUSION

Mr. DeVore put his employer on notice that he needed to take FMLA leave. He was fired less than two months later under circumstances and for alleged reasons that a jury could find were a pretext. Finally, the honest belief rule does not absolutely shield UPS from responsibility for its illegal actions.

29

At the end of the day, UPS fired an employee of nearly thirty years and used as its justification a mistake that cost less than $100. The true reason was Mr. Johnston's desire not to be inconvenienced by Mr. DeVore's medical leave. The FMLA exists to ensure this does not happen without consequences to the employer. Therefore, for the reasons set forth above, Mr. DeVore respectfully requests that this Court reverse the judgment of the Western District of Kentucky and remand this matter for further proceedings.

*/s/ Chris K. Stewart*
John S. Friend
Chris K. Stewart
Lauren E. Freeman
Bishop Friend, P.S.C.
6520 Glenridge Park Place
Suite 6
Louisville, KY 40222
(502) 625-2600
John@bishoplegal.net
Lauren@bishoplegal.net
Chris@bishoplegal.net
Counsel for Plaintiff/Appellant

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that I am a member of the Bar of the United States Court of Appeals for the Sixth Circuit.

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i), because it contains less than 13,000 words, as determined by Microsoft Word (2018), including the headings and footnotes and excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The text appears in 14-point Times New Roman, a proportionally spaced typeface.

/s/ Chris K. Stewart  
Chris K. Stewart

## <u>CERTIFICATE OF SERVICE</u>

On October 14, 2022, I electronically filed this Appellee's Brief with the Clerk of the Court using the CM/ECF system and the Brief was served via the CM/ECF system upon counsel of record for the Appellant.

/s/ *Chris K. Stewart*

## DESIGNATION OF RELEVANT LOWER-COURT DOCUMENTS

| Record No. | Description | Page ID#s |
|---|---|---|
| 1 | COMPLAINT against United Parcel Service, Inc. | 1-7 |
| 54 | MOTION for Summary Judgment by Defendant United Parcel Service Co. (Attachments: # 1 Exhibit 1 - Devore depo excerpts, # 2 Exhibit 2 - Job description, # 3 Exhibit 3 - EHP chart, # 4 Exhibit 4 - Leaves of absence, # 5 Exhibit 5 - CBA, # 6 Exhibit 6 - Downs depo excerpt, # 7 Exhibit 7 - Fridley depo excerpt, # 8 Exhibit 8 - Deignan depo excerpt, # 9 Exhibit 9 - Crew scheduling policy, # 10 Exhibit 10 - Development resources tool chart, # 11 Exhibit 11 - Buckman e-mail, # 12 Exhibit 12 - Martin depo excerpt, # 13 Exhibit 13 - 5/24/18 e-mail, # 14 Exhibit 14 - audio file, # 15 Exhibit 15 - EC re Ricks conversation, # 16 Exhibit 16 - audio file, # 17 Exhibit 17 - Opinion affirming, # 18 Exhibit 18 - FMLA info, # 19 Exhibit 19 - UPS' 6th suppl. resps., # 20 Exhibit 20 - UPS' discovery resps, # 21 Proposed Order) (Nahavandi, Amir) (Attachment 3 replaced on 11/3/2021) (SRH). | 184-349 |
| 62 | RESPONSE to Motion re 54 MOTION for Summary Judgment filed by Richard Devore. (Attachments: # 1 Exhibit 1 - DeVore Deposition Excerpts, # 2 Exhibit 2 - Wharton Deposition Excerpts, # 3 Exhibit 3 - Downs Deposition Excerpts, # 4 Exhibit 4 - Martin Deposition Excerpts, # 5 Exhibit 5 - Yates Deposition Excerpts, # 6 Exhibit 6 - Bradshaw Deposition Excerpts, # 7 Exhibit 7 - Blake Weshoff Affidavit, # 8 Exhibit 8 - Joe Lynott Affidavit, # 9 Exhibit - UPS Internal Correspondence, # 10 Exhibit 10 - UPS Internal Correspondence 2, # 11 Exhibit 11 - UPS Internal Correspondence 3, # 12 Exhibit 12 - Putt Deposition Excerpts, # 13 Proposed Order Denying Motion for Summary Judgment) (Friend, John) | 373-494 |

69          MEMORANDUM OPINION by Senior Judge Charles R. Simpson, III on 6/27/2022 re 54 MOTION for Summary Judgment. The motion of UPS for summary judgment will be granted in a separate order. cc: counsel (SRH) (Entered: 06/28/2022)

551-567

70          ORDER signed by Senior Judge Charles R. Simpson, III on 6/27/2022 granting 54 Motion for Summary Judgment. cc: Counsel (SRH) (Entered: 06/28/2022)

568

71          NOTICE OF APPEAL as to 70 Order on Motion for Summary Judgment by Richard Devore. Filing fee $ 505, receipt number AKYWDC-3624577. (Friend, John) (Entered: 07/27/2022)

569